UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BEVERLY WILMORE,
    *Plaintiff*,

v.

CHARTER COMMUNICATIONS LLC and
SPECTRUM REACH, LLC,
    *Defendants*.

No. 3:21-cv-01271 (JAM)

**ORDER GRANTING MOTION TO COMPEL ARBITRATION**

    Charter Communications ("Charter") emailed its employees notifying them that unless they opted out in the next 30 days, all workplace disputes would be submitted to mandatory arbitration. Plaintiff Beverly Wilmore worked for Charter, and she opened the email but did not opt out as she could have done. After Charter terminated Wilmore's employment the following year, she sued Charter and one of its business units, Spectrum Reach ("Spectrum")—alleging race and disability discrimination.

    The defendants have moved to compel arbitration. Because the record shows that Wilmore assented by her conduct to arbitration and because her claims are within the scope of the arbitration agreement, I will grant the motion to compel arbitration.

**BACKGROUND**

    Plaintiff Beverly Wilmore worked as a Senior Manager of Digital Sales at Spectrum, a Charter brand, from 2012 to 2018.[1] Wilmore is black, and she alleges that despite her excellent performance ratings white employees with similar work histories advanced more quickly in the company and that few black people at Spectrum occupied positions at or above the Senior Manager level.[2]

---

[1] Doc. #10 at 3–4 (¶ 4); Doc. #81-2 at 5.
[2] Doc. #10 at 4–5 (¶¶ 15–17).

1

On Friday, October 6, 2017, Charter sent an email to all active non-union employees below the level of Executive Vice President who were not on a leave of absence.[3] The email bore the subject line "Charter's Code of Conduct and Employee Handbook."[4] It described in general terms the purpose of the company's Code of Conduct and Employee Handbook and that these documents were available to all company employees on "Panorama," the company's internal website.[5]

The email then advised that "[e]ven with clearly articulated standards, guidelines and policies, we understand that workplace conflicts arise from time to time" and that "[i]n the unlikely event of a dispute not resolved through the normal channels, Charter has launched *Solution Channel*, a program that allows you and the company to efficiently resolve covered employment-related legal disputes through binding arbitration."[6] The email went on to describe how arbitration would waive the right to court litigation and how an employee could opt out of the commitment to participate in arbitration within 30 days:

> By participating in *Solution Channel*, you and Charter both waive the right to initiate or participate in court litigation (including class, collective and representative actions) involving a covered claim and/or the right to a jury trial involving any such claim. More detailed information about *Solution Channel* is located on Panorama. Unless you opt out of participating in *Solution Channel* within the next 30 days, you will be enrolled. Instructions for opting out of *Solution Channel* are also located on Panorama.[7]

The email included a hyperlink to Panorama, and Panorama contained opt out instructions and included a link to the arbitration agreement.[8]

---

[3] Doc. #83 at 1 (¶ 6).
[4] Doc. #83-5 at 2.
[5] *Ibid.*
[6] *Id.* at 3.
[7] *Ibid.*
[8] Doc. #83 at 2–3 (¶¶ 10-12); *see* Doc. #83-2 (Panorama website); Doc. #83-3 at 2-6 (arbitration agreement).

The arbitration agreement states that arbitration is a "condition of … your employment" and that "any dispute arising out of or relating to your … employment with Charter or the termination of that relationship, except as specifically excluded below, must be resolved through binding arbitration."[9] Covered claims include "claims for unlawful termination, unlawful failure to hire or failure to promote, … unlawful discrimination or harassment … , [and] claims arising under the … Americans with Disabilities Act."[10] The agreement covers claims against both Charter and "any of its subsidiaries … or affiliated entities."[11]

The defendants have submitted evidence—two spreadsheet entries, supported by an employee affidavit interpreting those entries—that Wilmore opened the email, but did not click any of the links in the email.[12] For her part, Wilmore states that she "did not review, nor did any person at Charter Communications, LLC or Spectrum Reach, LLC ever personally ask me to review, a dispute resolution agreement titled 'Solution Channel.'"[13] But Wilmore acknowledged during a deposition that she checked her emails regularly during the workday.[14]

On Monday, October 9, 2017, Wilmore began a health leave for hip surgery pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*.[15] She claims that she had no access to her work email between October 9 and when she returned to work several months later on February 1, 2018.[16] Charter has no record of Wilmore opting out of Solution Channel, nor does Wilmore allege that she attempted to do so—either within the 30-day period or at any time after she returned to work.[17]

---

[9] Doc. #83-3 at 2 (¶ A).
[10] *Id*. at 2 (¶ B.1).
[11] *Ibid.* (¶ B.2).
[12] Doc. #82 at 2 (¶¶ 5–7); Doc. #82-1; Doc. #82-2.
[13] Doc. #38-4 at 2 (¶ 2).
[14] Doc. #38-1 at 53.
[15] Doc. #10 at 5 (¶ 18); Doc. #92 at 3–5.
[16] Doc. #92 at 5.
[17] Doc. #80 at 10 n.2, 15; Doc. #83 at 4 (¶¶ 22–23).

Wilmore resumed working for Charter in February and March 2018 until her health problems resulted in her taking leave again in April 2018.[18] Then, in June 2018, Charter fired Wilmore.[19]

In October 2019, Wilmore brought a class action on behalf of all black employees subjected to race discrimination by Charter and Spectrum.[20] Wilmore alleges that the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 by engaging in intentional discrimination (Count One) and that they violated Title VII by engaging in disparate impact discrimination (Count Two).[21] She also alleges individual claims against Charter and Spectrum for violating the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* (Count Three).[22]

Wilmore originally sued the defendants in the Southern District of New York.[23] In August 2020, the U.S. District Court for the Southern District of New York ordered jurisdictional discovery and discovery concerning whether Wilmore's claims were subject to mandatory arbitration.[24] Because Charter and Spectrum maintain a principal place of business in Stamford, Connecticut, the parties consented to the case's transfer to this District.[25] In March 2022, the defendants moved to compel arbitration pursuant to the terms of the Solution Channel arbitration agreement.[26]

---

[18] Doc. #10 at 5 (¶ 18); Doc. #92 at 5.
[19] Doc. #38-6; *see* Doc. #10 at 5 (¶ 19).
[20] Doc. #1 at 6–7 (¶ 23); *see also* Doc. #10 at 6–7 (¶ 23) (operative complaint).
[21] Doc. #10 at 15–17 (¶¶ 36–45).
[22] *Id.* at 17–18 (¶¶ 46–52).
[23] *See* Doc. #1 at 1.
[24] Doc. #29.
[25] Docs. #40, #41, #42, #43.
[26] Docs. #79, #80.

**DISCUSSION**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, requires enforcement of agreements to arbitrate and embodies "a national policy favoring arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016).[27] Because arbitration "is a matter of consent, not coercion," however, the FAA "does not require parties to arbitrate when they have not agreed to do so." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293–94 (2002).

"In deciding whether to compel arbitration, a court must first decide whether the parties agreed to arbitrate." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022). Courts apply a "standard similar to that applicable for a motion for summary judgment," that is, courts must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, … together with … affidavits," and must "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229. "The party seeking to compel arbitration must 'substantiate its entitlement to arbitration by a showing of evidentiary facts' that support its claim that the other party agreed to arbitration. 'If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.'" *Maguire v. Ameriprise Fin. Servs., LLC*, 2022 WL 1718038, at *5 (D. Conn. 2022) (quoting *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)); *accord Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022).

"Only if the court concludes an agreement to arbitrate exists does it determine (1) the scope of the agreement to arbitrate; (2) whether Congress intended any federal statutory claims

---

[27] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

asserted to be non-arbitrable; and (3) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Zachman*, 49 F.4th at 101.

### *Whether the parties agreed to arbitrate*

As an initial matter, I conclude that there is no genuine fact issue to dispute that Wilmore received and opened an email from Charter advising her that Charter was requiring her to agree to arbitration unless she wished to opt out of arbitration within 30 days. Wilmore does not offer enough evidence to create a genuine dispute regarding whether she opened the arbitration email. To be sure, Wilmore's briefing asserts that she "disputes seeing the email" and cited her own affidavit in support.[28] And an affidavit containing an unequivocal denial may be enough to raise a genuine issue of fact. *See Barrows*, 36 F.4th at 50. But Wilmore's affidavit does not unequivocally deny that she saw the email. Instead, her affidavit states that she "did not review, nor did any person at Charter Communications, LLC or Spectrum Reach, LLC ever personally ask me to review, a dispute resolution agreement titled 'Solution Channel.'"[29]

Thus, the affidavit constitutes an unequivocal denial that Wilmore ever reviewed the arbitration *agreement*, but it says nothing to controvert the defendants' evidence that she received and opened the arbitration *email*. So I will analyze whether the parties formed an agreement on the assumption that Wilmore received and opened the arbitration email but that—crediting Wilmore's affidavit—she did not click on the email's hyperlink to Panorama or review the arbitration agreement itself.

Whether the parties agreed to arbitrate is a question of state contract law. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73–74 (2d Cir. 2017). Specifically, I must decide if Wilmore agreed to arbitration and must

---

[28] Doc. #92 at 4–5 (citing Doc. #38-4 at 2–3 (¶¶ 2–4)) (capitalization altered).
[29] Doc. #38-4 at 2 (¶ 2).

"apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

The parties, however, disagree about which state law applies. The defendants argue that Alabama law applies because Wilmore worked in Alabama from 2014 to when she was terminated in 2018 and because her accommodation requests and applications for promotion occurred in Alabama.[30] By contrast, Wilmore argues that New York law applies because "a large part of the Defendants' Human Resources apparatus," including the employee who fired Wilmore, worked in New York, and because Spectrum's headquarters are in New York.[31] Charter's headquarters are in Connecticut.[32]

Neither side alleges that a choice of law provision applies to this dispute. Absent a choice of law provision, Connecticut has adopted the Second Restatement's "most significant relationship" approach to determining which jurisdiction's law governs a contract. *Discover Prop. & Cas. Ins. Co. v. Tetco, Inc.*, 2014 WL 685367, at *4 (D. Conn. 2014) (citing Restatement (Second) of Conflict of Laws § 188; *American States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461 (2007)). Section 188 of the Restatement sets forth five factors for courts to consider in determining the applicable law:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

---

[30] Doc. #80 at 14.
[31] Doc. #92 at 11–13.
[32] *Id.* at 13.

Restatement (Second) of Conflict of Laws § 188(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Ibid*. Further, "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied." *Id.* § 188(3).

Wilmore lived and worked in Alabama from December 2014 to the termination of her employment in June 2018.[33] This period encompassed Wilmore's two health leaves and her receipt of the arbitration email on October 6, 2017. She also applied for several promotions while working in Alabama.[34] These contacts are significant enough to conclude that Alabama law applies to the formation of the arbitration agreement, recognizing that several courts applying the same most-significant-relationship test have come to similar results on similar facts. For example, a Connecticut district court applied Connecticut state law to an arbitration dispute with a California corporation where the plaintiff entered into an employment contract in Connecticut, was working in Connecticut when the underlying dispute arose, and participated remotely from Florida in a Connecticut mediation. *See Bezek v. NBC Universal*, 2018 WL 2337131, at *9 (D. Conn. 2018), *aff'd*, 770 F. App'x 599 (2d Cir. 2019); *see also Thompson v. Body Sculpt Int'l, LLC*, 2018 WL 3235545, at *3 n.3 (E.D.N.Y. 2018) (because "the majority of plaintiffs' work took place in New York" and one of the plaintiffs resided in New York, New York law governed the arbitration contract's validity and enforcement); *Owen v. MBPXL Corp.*, 173 F. Supp. 2d 905, 913 (N.D. Iowa 2001) ("Iowa has the most significant relationship to [plaintiff's] claims because (1) the most recent incidences of alleged age discrimination occurred while [plaintiff] was employed at the Orange City, Iowa facility, and (2) the arbitration agreement was allegedly

---

[33] Doc. #10 at 3–4 (¶ 4); Doc. #38-1 at 14–15; Doc. #81-1 at 2; Doc. #92 at 2.
[34] Doc. #38-1 at 33–37; Doc. #92 at 2–3.

formed while [plaintiff] was employed in Iowa."). In short, I will apply Alabama law to decide if Wilmore agreed to arbitration.

Wilmore argues that she did not agree to arbitration because she never signed the arbitration agreement.[35] But under Alabama law, and as Wilmore acknowledges, "express assent is not required in order for an arbitration provision to be enforceable." *Providian Nat. Bank v. Conner*, 898 So. 2d 714, 718 (Ala. 2004).[36] "The purpose of a signature on a contract is to show mutual assent; however, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent." *I.C.E. Contractors, Inc. v. Martin & Cobey Constr. Co.*, 58 So.3d 723, 725–26 (Ala. 2010).

So the fact that Wilmore never signed the arbitration agreement is not dispositive. Indeed, the arbitration agreement itself does not have any signature lines for either party to complete in the manner of a traditional contract. This is consistent with the fact that the company created an alternative contractual agreement procedure as described above by notifying employees by email of the arbitration requirement, affording access to the arbitration agreement, and allowing employees to opt out of arbitration within 30 days.[37]

Wilmore also insists that she did not review the arbitration agreement. But even accepting this as true, I understand Alabama law—consistent with basic "inquiry notice" principles of contract formation—to bind an employee to an arbitration agreement if the employer has advised the employee that it requires arbitration as a condition of employment (or, as here, if it advises the employee that it requires arbitration but allows the employee to opt out within a fixed period

---

[35] Doc. #92 at 16.
[36] *Id*. at 17.
[37] Doc. #83 at 1–3 (¶¶ 6 –18).

9

of time) *and* if the employer provides a copy of or a link to the arbitration agreement for the employee to review if the employee wishes to do so.

Courts applying Alabama law in similar contexts have ruled that such notice of an arbitration requirement and an opportunity to access the arbitration agreement is enough to form an agreement to arbitrate. *See Patel v. Regions Bank*, 2019 WL 2601343, at *3–4 (M.D. La. 2019) (applying Alabama law to conclude that after plaintiff "was made aware of the existence of the arbitration agreement when he signed the Credit Card Application," then "[e]ven if Plaintiff had not received a copy of the Card Holder Agreement containing the arbitration clause, Alabama law deems that he was on notice that he *should have* received such documents, and thereby had a duty to investigate their whereabouts"), *aff'd on other grounds*, 808 F. App'x 242 (5th Cir. 2020) (*per curiam*); *Wright v. Cir. City Stores, Inc.*, 82 F. Supp. 2d 1279, 1284–85 (N.D. Ala. 2000) (applying Alabama law to conclude that employee who signed receipt acknowledging that he had received company handbook with arbitration provision and who watched video explaining the arbitration program was bound to arbitrate after he failed to opt out within 30 days).

Not to the contrary is the Alabama Supreme Court's decision in *Moore-Dennis v. Franklin*, 201 So. 3d 1131, 1139–43 (Ala. 2016). The court in *Moore-Dennis* was faced with the issue of whether an elderly bank customer had agreed to arbitrate disputes with the bank. There was no evidence that anyone at the bank told the customer of any arbitration agreement, such as by sending an email referencing arbitration. The court concluded that the bank's posting of the arbitration requirement and agreement to the customer's online banking profile did not give sufficient notice of the arbitration agreement to the customer in the absence of evidence to show that the customer or his family representative ever accessed the customer's online banking

profile or otherwise received actual notice in emails sent by the bank of any duty to arbitrate disputes with the bank. *Id.* at 1143-44.

The scenario presented in *Moore-Dennis* is very different from the one before me in this case. In contrast to the customer in *Moore-Dennis* who did not receive any such notice by email of an arbitration requirement, Wilmore received and opened an email unambiguously alerting her of the arbitration agreement. Indeed, the court in *Moore-Dennis* distinguished cases where companies sent emails that "told the recipients that the companies had adopted an arbitration provision and provided a link to the provision; the e-mails in this case [*Moore-Dennis*] stated merely that [the customer's] statements were ready for review." *Id.* at 1143 (distinguishing *Versmesse v. AT&T Mobility LLC*, 2014 WL 856447 (N.D. Ind. 2014); and *Karzon v. AT&T, Inc.*, 2014 WL 51331 (E.D. Mo. 2014)).

It is true that Wilmore was on medical leave for most of the 30-day period following her receipt of the arbitration email. But she had at least some time—October 6 to October 9, 2017—to opt out before taking medical leave, and Wilmore does not dispute that she could have opted out during this period. Nor does the record reflect that she made any effort to opt out when she returned to work in February 2018 or at any time before the filing of this lawsuit. Because Wilmore had notice and opportunity to opt out of the arbitration agreement and she did not do so, I conclude that under Alabama law Wilmore agreed to arbitrate her claims with the defendants pursuant to the terms of the agreement.

As noted above, Wilmore has urged that I should apply New York law. But the result would be the same because New York law holds that an employee's assent to arbitration may be inferred if the employee receives an email from the employer about an arbitration policy and continues to work for the employer. *See Boves v. Aaron's Inc.*, 2019 WL 1206698, at *4–5

(S.D.N.Y. 2019) (applying New York law); *Lockette v. Morgan Stanley*, 2018 WL 4778920, at *4 (S.D.N.Y. 2018) (same); *see also Manigault v. Macy's E.*, LLC, 318 F. App'x 6, 7–8 (2d Cir. 2009) (applying the same rule for physical mail).

### *The scope of the agreement*

Given that the parties agreed to arbitrate, the Court must determine the scope of the arbitration agreement. *See Zachman*, 49 F.4th at 101. "Where the question is whether a given dispute falls within the scope of the arbitration agreement (and is therefore arbitrable), any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021). That said, "arbitration is a matter of contract and it is the language of the contract that defines the scope of disputes subject to arbitration." *LAVVAN, Inc. v. Amyris, Inc.*, 2022 WL 4241192, at *3 (2d Cir. 2022).

The arbitration agreement extends broadly to cover "any dispute arising out of or relating to" the employee's "employment with Charter or the termination of that relationship," including "claims for unlawful termination, unlawful failure to hire or failure to promote, … unlawful discrimination or harassment … , [and] claims arising under the … Americans with Disabilities Act."[38] The agreement covers claims against both Charter and "any of its subsidiaries … or affiliated entities."[39]

Wilmore's complaint alleges race and disability discrimination by Charter and Spectrum, one of Charter's brands that operates as a business unit within Charter.[40] Wilmore does not dispute that, if the arbitration agreement applies to her claims against Charter, it also applies to her claims against Spectrum.

---

[38] Doc. #83-3 at 2 (¶¶ A, B.1).
[39] *Ibid*. (¶ B.2).
[40] *See* Doc. #80 at 18–19; Doc. #81-2 at 5; Doc. #81-3 at 3; *see generally* Doc #10.

Wilmore cites *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70 (1998), for the propositions that "waiver [of statutory rights] must be clear and unmistakable," and that a "general contractual provision" is insufficient for waiver. *Id*. at 80.[41] But *Wright* is not an FAA case. *Id.* at 77 n.1. Rather, the Supreme Court expressly limited *Wright* to the collective-bargaining context, *id.* at 82 n.2, and Wilmore points to no authority extending *Wright* to employment disputes outside this context.

Wilmore does not otherwise dispute that her claims are within the list of covered claims. Further, there is no indication that Congress intended Wilmore's Title VII or ADA claims to be non-arbitrable. Indeed, the Second Circuit and the Supreme Court have repeatedly held that claims arising under employment discrimination statutes, including Title VII and the ADA, may be subject to mandatory arbitration, and have rejected the suggestion that Congress intended for these claims to be non-arbitrable. *See Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) (Title VII); *McAllister v. Conn. Renaissance Inc.*, 496 F. App'x 104, 106 (2d Cir. 2012) (Title VII and ADA); *Borden v. Wavecrest Mgt. Team Ltd.*, 572 F. App'x 10, 11 (2d Cir. 2014) (ADA); *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001) ("The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law.").

Because the arbitration agreement covers race and disability discrimination claims against Charter and Spectrum, I conclude that all of Wilmore's claims are subject to arbitration pursuant to the terms of the arbitration agreement.

---

[41] Doc. #92 at 17.

13

*Stay or dismissal*

Finally, I must determine whether to stay or dismiss the action. A stay is mandatory when all claims have been referred to arbitration and a stay has been requested. *See Katz v. Cellco P'ship*, 794 F.3d 341, 345–47 (2d Cir. 2015); 9 U.S.C. § 3. The defendants have requested a stay.[42] Therefore, I will stay the action pending resolution of the arbitration pursuant to the terms of the arbitration agreement. The parties shall proceed to arbitration, and the Court expects that Wilmore will receive a prompt and fair hearing in accordance with the arbitration rules.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motion to compel arbitration (Doc. #79) and STAYS the action pending resolution of the arbitration.

It is so ordered.

Dated at New Haven this 14th day of March 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[42] Doc. #80 at 20.